IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,    )<br>                              )<br>            Plaintiff,        )<br>                              )<br>    v.                        )<br>                              )<br>TRINA MAHR,                   )<br>                              )<br>            Defendant.        ) | 8:12CR222<br><br>FINDINGS AND<br>RECOMMENDATION |

This matter is before the court on the Motion to Suppress (Filing No. 17) filed by defendant Trina Mahr (Mahr). Mahr is charged in the Indictment with the June 12, 2012, possession of methamphetamine with intent to distribute (Count I) in violation of 21 U.S.C. § 841(a)(1). See Filing No. 1. The Indictment also alleges a Forfeiture Allegation relating to $7890 under 21 U.S.C. § 853. *Id.* Mahr seeks to suppress evidence seized from her person and vehicle and all statements obtained by Omaha Police Department (OPD) officers on June 12, 2012.

The court held a hearing on the motion on October 2, 2012. Mahr was present with her counsel, Donald L. Schense. The United States was represented by Assistant U.S. Attorney Robert C. Sigler. The court heard the testimony of OPD Officers Patrick Dempsey (Officer Dempsey) and Cody Baines (Officer Baines). The court also received in evidence an OPD Permission to Search Form as Exhibit 1. A transcript (TR.) of the hearing was prepared and filed on October 10, 2012, at which time the matter was deemed submitted. See Filing No. 29.

**FINDINGS OF FACT**

Within two weeks prior to June 12, 2012, multiple shots were fired and fight disturbances reported in front of a house known as a "gang hangout" on the east side of 10th Street (TR. 8). Officer Dempsey was involved with two shots-fired incidents at the location and knew about other incidents from police bulletins (TR. 8). During roll call before the officers' patrol on June 12, 2012, the gang unit advised the officers of drug dealing activity at the known gang hangout on 10th Street (TR. 9-10, 28-30).

At about 3:30 a.m. on June 12, 2012, Officers Dempsey, an officer with OPD for two years and nine months, and Baines, an officer with OPD for approximately seven years, were in uniform in a marked OPD cruiser and on patrol in the Southeast Precinct in Omaha, Nebraska (TR. 5-6, 56).  The Southeast Precinct encompasses the 10th Street and Bancroft area (TR. 24).  As the officers drove southbound on 10th Street from Bancroft Street, they observed a blue Lexus automobile facing east bound at a stop sign on Frederick Street (TR. 7).  As they drove past the Lexus, Officer Baines noted the license plate number and ran the plate numbers through NCIC (TR. 7).  The license plate number was for a blue Lexus registered to an address in west Omaha (TR. 9).  Officer Dempsey testified he runs every license plate he sees while on routine patrols in the cruiser (TR. 31).

While Officer Baines ran the plate, the officers lost sight of the Lexus for two minutes as they drove down 10th Street, took the loop behind the stadium, turned down Frederick Street, and then came back on 10th Street (TR. 9, 26).  The officers observed the occupied Lexus parked on the east side of 10th Street, facing north (TR. 9-10).  The Lexus traveled 200 hundred yards since the officers initially identified the Lexus (TR. 26).  The Lexus was the only vehicle the officers observed (TR. 25).  The Lexus was parked legally (TR. 10, 28, 66).  The officers had not observed any traffic violations (TR. 24-25, 66).  The officers did not see any activity or gang members in the vicinity of the Lexus (TR. 30).

After seeing the parked Lexus, Officers Dempsey and Baines discussed why the Lexus was parked two houses north, about 100 feet, of a known gang hangout (TR. 10, 28-29).  The Lexus was also parked fifty feet south of a house where shots-fired were reported (TR. 29).  However, the Lexus was never associated with the shots-fired incidents or gang activity (TR. 29, 66-67).  Although Officer Dempsey did not witness an individual exit the Lexus and make contact with the known gang hangout, the officers believed the Lexus was suspicious and did not belong in the area at 3:30 in the morning (TR. 10, 32-33).

The officers parked behind the Lexus and approached the Lexus to "make sure everything was okay," and they also wanted to determine whether the occupants of the Lexus "were involved in any illegal activity or advise them for their safety" (TR. 10, 27, 68).  Although streetlights were on, there were none directly overhead the Lexus (TR. 54).  The officers did not have any spotlights or emergency lights on, only the cruiser's headlights

(TR. 54). Officers Dempsey and Baines both approached the Lexus on the driver's side (TR. 11, 57). The officers' guns were holstered and Officer Dempsey had his flashlight on (TR. 36). The Lexus' driver-side window was down and there was one individual, later identified as Mahr, in the Lexus (TR. 11, 37). Officer Dempsey noted Mahr had McDonald's take out with her, but does not recall whether Mahr was eating (TR. 28). Officer Dempsey made first contact with Mahr and asked what Mahr was doing at the location, which was a known high drug, high crime area, when the Lexus was registered to a west Omaha address (TR. 11-12, 35). Mahr stated she was taking a friend, who had just entered the house where the Lexus was parked, to deliver some food (TR. 15, 37). Officer Dempsey asked Mahr if she was visiting a friend at the known gang hangout two houses south of Mahr's location (TR. 12). Mahr stated "no" and began conversing generally with Officer Baines (TR. 12, 37, 57). Officer Baines, trained in interdiction, asked Mahr about the friend who entered the house in order to compare stories with the friend (TR. 58).

While Mahr spoke with Officer Baines, Officer Dempsey walked around the backside of the Lexus to ensure there were no weapons within the vicinity of the Lexus (TR. 12, 41-42). Officer Dempsey looked inside the Lexus with a flashlight and saw the butt stock of what appeared to be a rifle or shotgun sitting on the rear passenger floorboard (TR. 12-13). Officer Dempsey communicated to Officer Baines there was some sort of weapon in the backseat (TR. 13, 39). Officer Baines removed Mahr from the Lexus in order for Officer Dempsey to clear the firearm from the scenario for the officers' safety (TR. 13, 39, 59). Officer Dempsey reached in the Lexus and secured the firearm (TR. 13). Once he removed the firearm, Officer Dempsey realized it was a BB gun (TR. 13). Mahr did not inform Officer Dempsey a BB gun was in the Lexus before he retrieved the BB gun (TR. 40-41).

Officer Baines and Mahr were at the back of the Lexus when Officer Dempsey removed the BB gun (TR. 14). Mahr was not in handcuffs or under arrest (TR. 14-15, 59). Officer Dempsey joined the pair and asked Mahr whether any weapons, narcotics, or drug paraphernalia were in the Lexus (TR. 14). Mahr responded "no" and told Officer Dempsey "you can search it if you want to" (TR. 14). Officer Dempsey testified "maybe ten minutes"

transpired between the time he approached the Lexus and received consent to search the Lexus (TR. 22-23). Officer Dempsey testified he did not have a written consent to search form available (TR. 19). Officer Dempsey testified he did not threaten Mahr to obtain her permission to search and did not make any promises to Mahr (TR. 22). Mahr did not make any complaints about the officers' contact or her mental state (TR. 15). Further, Mahr did not appear to be under the influence of alcohol or drugs (TR. 15). However, Mahr appeared extremely nervous (TR. 15). Mahr stuttered, kept looking at the officers, the house, and the Lexus and used "very many words to explain to us that her friend was in the house" (TR. 45).

After Mahr consented to a search, Officer Dempsey secured Mahr in the police cruiser (TR. 16-17, 43). Officer Dempsey secured Mahr in the cruiser for officer safety because two additional females, who exited the house next to where the Lexus was parked, were in the area (TR. 44). Mahr was not handcuffed (TR. 17, 43). Officer Dempsey entered the Lexus through the driver's side and noticed a large purse (TR. 17). Officer Dempsey opened the purse and observed two smaller bags, a black makeup bag and a brown makeup bag (TR. 17-18). In the black bag, there was $7890 in cash (TR. 17-18). In the brown bag there were three bags containing eighteen grams of methamphetamine (TR. 17-18).

During Officer Dempsey's search, Officer Baines was on the sidewalk engaged in conversation with a female, later identified as Jacqueline Miranda-Funes (Miranda-Funes), who exited the house and advised Officer Baines that she was in the Lexus prior to the officers' contact with Mahr (TR. 48, 60). Officer Baines also had contact with a third female, later identified as Candace Monter (Monter), who exited the house (TR. 60-62). After Officer Dempsey discovered the money and narcotics, Officer Baines placed Miranda-Funes under arrest (TR. 18, 44, 61). Officer Baines also executed a consent to search form of Monter's residence (TR. 62).

After conducting the search, Officer Dempsey placed Mahr under arrest (TR. 18). Mahr was not Mirandized (TR. 52). Officers Dempsey and Baines transported Mahr to Douglas County Corrections (TR. 18). Officer Baines attempted to interview Mahr;

however, Mahr made no statements to the officers while en route to Douglas County Corrections (TR. 52, 64-65). Miranda-Funes was transported in another cruiser (TR. 48).

Mahr was booked at Douglas County Corrections at 5:15 a.m. (TR. 53). At Douglas County Corrections, Officer Dempsey had Mahr sign a written consent to search form to document Mahr gave the officers verbal consent to search the Lexus (TR. 19, 51; Ex. 1). Mahr signed the form without objection during the booking process (TR. 19, 49-50, 64). The form indicates Officer Dempsey entered the Lexus at 3:45 a.m. and exited the Lexus at 4:00 a.m. on June 12, 2012 (TR. 20, 49; Ex. 1). Officers Dempsey and Baines did not sign the form (TR. 50; Ex. 1). There is also no supervisor, lieutenant, or captain's signature on the form, although Officer Dempsey testified he believed a supervisor, lieutenant, or captain signed the form (TR. 50; Ex. 1).

At Douglas County Corrections, Officer Baines asked Mahr general questions about the narcotics and money to learn information on future drug dealings in the area (TR. 70-71). Mahr responded she was currently on federal probation for possession with intent to deliver (TR. 72). Mahr never informed Officer Baines she did not want to speak with him, Mahr simply stopped speaking with him (TR. 73). Officer Baines' conversation with Mahr lasted about one minute (TR. 72). Officer Baines testified he did not read Mahr her **Miranda** rights but he believed Mahr was **Mirandized** by another officer (TR. 70).

During the booking process, Mahr stated, to herself, "I don't know why I gave them permission to search the vehicle" (TR. 54). While Officer Dempsey and Mahr executed the consent form, Officer Baines, in close proximity to Mahr, informed Miranda-Funes of the charges against her (TR. 21, 73). Mahr stated "everything in the vehicle is mine" (TR. 21-22). Officer Baines testified he was speaking with Miranda-Funes when Mahr made the statement and Mahr's statement was not in response to a question posed by Officer Baines (TR. 74-75).

5

**LEGAL ANALYSIS**

Mahr argues evidence found in the Lexus and statements she made should be suppressed because no reasonable suspicion or probable cause existed for the officers to approach Mahr's vehicle, the officers' encounter was pretextual, the officers unlawfully seized Mahr, and Mahr's statements are derived from an unlawful stop and detention.  **See** Filing No. 22 - Brief p. 1-2.

**A.     Officers' Initial Contact**

Mahr argues the officers did not have reasonable suspicion or probable cause to approach her as she sat in a legally parked Lexus on 10th Street.  **See** Filing No. 22 - Brief p. 2-3.  Mahr argues she was detained and the contact was unreasonably prolonged and therefore constitutes an unconstitutional seizure.  *Id.* at 4-6.

"Not every encounter between a police officer and a citizen constitutes a seizure under the Fourth Amendment."  *United States v. Mabery*, 686 F.3d 591, 595 (8th Cir. 2012).  Taking the "position that a person is 'seized' for Fourth Amendment purposes whenever an officer interrupts what that person was otherwise doing is absurd."  *United States v. Tarantola*, 332 F.3d 498, 499 (8th Cir. 2003).  Merely attempting to attract a person's attention to further investigate suspected criminal behavior "does not implicate any Fourth Amendment interest, does not amount to a seizure, and thus falls outside the ambit of the Fourth Amendment."  *Tarantola*, 332 F.3d 499-500 (knocking on glass door of laundromat is not a seizure).  More specifically, an officer's attempt to make contact with individuals occupying a vehicle parked in a public place does not constitute a seizure.  **See** *Mabery*, 686 F.3d at 596-97 (citing cases) (finding no seizure where officer shined a spotlight on vehicle from the street);  **see also** *United States v. Barry*, 394 F.3d 1070 (8th Cir. 2005) (finding no seizure where officer knocked on vehicle's window as it was parked in vacant parking lot behind a mall).

> In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable

> person that the person was not free to decline the officers'
> requests or otherwise terminate the encounter.

Mabery, 686 F.3d at 596. "Circumstances indicative of a seizure would include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id.

In this case, the officers patrolled a public area within the Southeast Precinct (TR. 24). Prior to patrolling the area, the OPD gang unit informed the officers of drug dealing activity at a known gang hangout on the east side of 10th Street (TR. 9-10, 28-30). Additionally, Officer Dempsey was aware that multiple shots were fired and fight disturbances reported around the known gang hangout within the previous two weeks (TR. 8). The officers, after running the Lexus' license plate through NCIC, discovered the Lexus was registered to a west Omaha address far away from the 10th Street address (TR. 7-9). The officers observed the Lexus parked on the east side of 10th Street within a couple of houses of the known gang hangout (TR. 10, 28-29). The officers believed the Lexus was suspicious and determined to make contact with the occupant (TR. 10, 27, 32, 68). The officers warned Mahr she was in a high drug, high crime area and asked why Mahr was in the area when her Lexus was registered to a west Omaha address (TR. 11-12, 35). None of the circumstances indicative of a seizure listed in *Mabery* are present in the officers' encounter with Mahr. Similar to *Mabery*, this appears to be "an otherwise-routine police-citizen encounter." Mabery, 686 F.3d at 596. Considering the circumstances, the officers' encounter with Mahr does not constitute an unconstitutional seizure when they stopped the cruiser behind Mahr's Lexus, approached Mahr, and initially made contact with her. There is also no evidence the officers' routine police-citizen encounter with Mahr was pretextual for manufacturing probable cause.

The contact was not unreasonably prolonged as Mahr argues. The officers initially extended the encounter with Mahr because Officer Dempsey noticed, what appeared at the time, a butt stock of a rifle or shotgun sitting on the rear passenger floorboard (TR. 12-13). At that point, Officer Baines removed Mahr from the Lexus (TR. 13, 29, 59). Mahr

remained uncuffed and stood with Officer Baines while Officer Dempsey removed the weapon (TR. 14-15).

"[O]fficers may take steps reasonably necessary to protect their personal safety." *United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008). Additionally, "[u]nder the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Brown*, 653 F.3d 656, 661 (8th Cir. 2011). "Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window . . . of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *Id.*

Officer Dempsey walked around the perimeter of the Lexus to ensure there were no weapons within the vicinity of the Lexus (TR. 12, 41-42). Officer Dempsey was in a lawful position and clearly viewed what appeared to be the butt stock of a rifle or shotgun sitting on the rear passenger floorboard. Officer Baines removed Mahr from the Lexus and in short order Officer Dempsey verified the butt stock belonged to a BB gun. Officer Dempsey's search was for the purpose of officer safety and to ensure Mahr did not have a weapon. Around ten minutes elapsed between the time the officers made initial contact with Mahr and Officer Dempsey investigated what he reasonably believed was a weapon. Accordingly, Officers Dempsey and Baines did not unreasonably prolong the encounter with Mahr. **See** *United States v. Garcia*, 613 F.3d 749, 754 (8th Cir. 2010) (holding a stop was not unreasonably prolonged when "[t]he whole encounter lasted less than 30 minutes").

### B.     Consensual Search

Mahr argues the Lexus was searched without valid consent and was unreasonably prolonged. **See** Filing No. 22 - Brief p. 3, 5-6. The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; **see** *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to the states through the Fourteenth Amendment). "While the Fourth Amendment does not permit warrantless searches, law

enforcement may conduct such a search if they obtain [the owner's] voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005). Such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. See *Quintero*, 648 F.3d at 667 (listing factors). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.* "When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted." *Garcia*, 613 F.3d at 753. "The government has the burden to prove the consent was voluntary by a preponderance of the evidence and based upon the totality of the circumstances." *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012).

The evidence indicates Mahr's consent was voluntary. Officer Dempsey testified Mahr did not appear to be under the influence of alcohol or drugs (TR. 15). There is no evidence Mahr made complaints about the contact with the officers or about her mental state. There is also no evidence the officers threatened, coerced, or made promises to Mahr to receive Mahr's consent. The search did not exceed the scope of the consent. When asked whether any weapons, narcotics, or drug paraphernalia were in the Lexus, Mahr responded "no" and informed Officer Dempsey he could search the Lexus (TR. 14). Mahr did not limit the scope of the search and a reasonable person would understand Mahr's consent to include the whole vehicle and the contents within the vehicle. See *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006) (**quoting** *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)) ("The issue [of scope of consent] is [determined by] what 'the

typical reasonable person [would] have understood by the exchange between the officer and the suspect.'").  Although the officers did not execute a consent to search form at the scene, that does not preclude a finding Mahr's consent was voluntary.  **See *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir. 1997)** (holding a written consent to search form is not necessary to establish voluntariness).  Further, Mahr signed a written consent form during the booking process to document she provided the officers consent to search the Lexus at the scene.

The officers did not unreasonably prolong the search of Mahr's Lexus.  The evidence indicates the consensual search lasted approximately fifteen minutes.  Mahr provided the officers consent to search the Lexus which necessarily implies Mahr's encounter with the officers would be extended.  The court finds the search of the vehicle was consensual, timely, and did not exceed the scope of Mahr's consent.

### C. Mahr's Statements

Mahr argues the statements she made must be suppressed as fruit of the unlawful search and seizure.  **See** Filing No. 22 - Brief p. 7.  Mahr argues the officers clearly violated her rights when they proceeded to question her about the contents within the Lexus after she was placed under arrest.  ***Id.***

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."  *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).  When determining whether a statement is voluntary, the court considers a totality of the circumstances, including:

> both the characteristics of the accused and the details of the interrogation . . . the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Houston v. Lockhart*, 866 F.2d 264, 266 (8th Cir. 1989) (**quoting *Hall v. Wolff*, 539 F.2d 1146, 1150-51 (8th Cir. 1976)**).  "The government bears the burden of persuasion and must

prove by a preponderance of the evidence that the challenged statements were voluntary." *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011).

At Douglas County Corrections, Officer Baines asked Mahr general questions about the narcotics and money to learn information on future drug dealings in the area the officers arrested Mahr (TR. 70-71). Mahr responded she was currently on federal probation for possession with intent to deliver and then stopped speaking with Officer Baines (TR. 72-73). Officer Baines' conversation with Mahr lasted about one minute and Mahr never informed Officer Baines she did not want to speak with him (TR. 72). Officer Baines then spoke with Miranda-Funes and informed her of her charges (TR. 21, 73). Officer Baines and Miranda-Funes were in close proximity to Mahr (TR. 21, 73). Without Officers Baines or Dempsey asking a question, Mahr stated "I don't know why I gave them permission to search the vehicle" and "everything in the vehicle is mine" (TR. 21-21, 54). There is no dispute neither Officer Dempsey nor Officer Baines read Mahr her *Miranda* rights. There is also no dispute Officer Baines asked Mahr questions about the narcotics after which Mahr responded she was currently on federal probation. However, Mahr is not seeking to suppress statements made in response to Officer Baines' questions. Instead, Mahr seeks to suppress statements made after Officer Baines stopped speaking with Mahr and was speaking with Miranda-Funes. There is no evidence Officer Baines asked Mahr any questions likely to elicit an incriminating response after Officer Baines ceased asking Mahr questions. The evidence indicates Officer Baines was not even asking Miranda-Funes questions but informing her of the charges against her. Mahr's statements appear voluntary. Mahr was not exposed to prolonged questioning, duress, or any influence from alcohol or narcotics. Further, there is no evidence Officer Baines, while informing Miranda-Funes of her charges, intended to elicit an incriminating response from Mahr. **See** *United States v. Abernathy*, No. CR 11–30042, 2011 WL 5403223, at *6 (D. S.D. Nov. 8, 2011) ("Any statements or questions that were volunteered by defendant, not in response to any police questioning, are not affected by *Miranda*."). As there were no constitutional infirmities with the officers' contact with Mahr and the consensual search of the Lexus, there is no fruit of the poisonous tree issue to address with regard to Mahr's statements.

Therefore, the court concludes Mahr's statements were voluntary and should not be suppressed.

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that:**

Mahr's Motion to Suppress (Filing No. 17) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 22nd day of October, 2012.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge